JOSEPH F. GILLIS & others vs. MASS. CABLEVISION, INC.

Barnstable.   November 5, 1975. — January 9, 1976.

Present: TAURO, C. J., QUIRICO, BRAUCHER, HENNESSEY, & KAPLAN, JJ.

*Statute*, Construction.   *License.   Community Antenna Television Systems.*

Statute 1971, c. 1103, § 4, providing that "any person who . . . has received a license or permit for construction and operation of a community antenna television system or has commenced construction or operation of such a community antenna television system," prior to the effective date of G. L. c. 166A, and who otherwise complies with c. 166A, "shall receive . . . a license which shall replace any prior permit or license," protected a licensee who had been granted a license by the selectmen of a town pursuant to c. 166, authorizing the granting of permits for laying lines under and across public ways and places and the establishment of regulations for the erection and maintenance of such lines, notwithstanding the fact that the license contained unauthorized or void terms. [527-534] KAPLAN, J., concurring.

BILL IN EQUITY filed in the Superior Court on July 19, 1973.

The suit was heard by *Travers*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Robert T. Capeless* for Mass. Cablevision, Inc. (*Edward W. Farrell,* Town Counsel, for the Board of Selectmen of Falmouth, with him).

*Joseph F. Gillis* for the plaintiffs.

*James D. St. Clair & Linda H. Wish* for Cape Cod Cablevision Corporation; *Michael B. Isaacs* for The Massachusetts Community Antenna Television Commission, and *Marshall Simonds, Kenneth Cohen & Cathleen Cavell* for The New England Cable Television Association, amici curiae, submitted briefs.

BRAUCHER, J. Community antenna television (CATV) systems are regulated under G. L. c. 166A, inserted by St. 1971, c. 1103, § 1. Section 4[1] of c. 1103 is a "grand-father clause," protecting any person who had previously "received a license or permit for construction and operation" of a CATV system. We are asked to determine whether a license issued to the defendant Mass. Cable-

---

[1] Section 4 reads: "The provisions of said chapter one hundred and sixty-six A and all rules, regulations, orders and promulgations of said commission pursuant to said chapter shall apply to all community antenna television systems authorized or constructed prior to the effective date of said chapter one hundred and sixty-six A, provided that nothing therein shall prevent any person who, prior to the effective date of said chapter one hundred and sixty-six A, has received a license or permit for construction and operation of a community antenna television system or has commenced construction or operation of such a community antenna television system in any city or town from continuing such construction or operation therein without applying for a license thereunder or paying an application fee, but such person shall within thirty days of the effective date of said chapter one hundred and sixty-six A submit to the issuing authority a bond in accordance with subsection (k) of section five of said chapter one hundred and sixty-six A. Said person shall within ninety days furnish said issuing authority all other information required by section four of said chapter one hundred and sixty-six A and shall comply with all other applicable sections of said chapter and shall receive from the issuing authority a license in conformity with section three of said chapter one hundred and sixty-six A which shall replace any prior permit or license, however designated. The term of such new license shall run from the date of its issuance for a term not more than fifteen years. Said new license may be renewed under the provisions of said chapter one hundred and sixty-six A."

vision, Inc. (the licensee), by the board of selectmen of
the town of Falmouth (the board) is such a "license or
permit." We hold that it is, and reverse the contrary
judgment appealed from.

The action was begun in the Superior Court in 1973 by
a bill for a declaratory judgment. After demurrers were
sustained, a petition for a writ of mandamus was sub-
stituted, and the defendants by amendment to their
answer sought declaratory relief. The case was submitted
on statements of agreed facts. In September, 1974, the
judge made "Findings, Rulings and Order," and in Oc-
tober, 1974, judgment was entered declaring that the
license was invalid and that the licensee had not com-
menced construction or operation before the effective
date of c. 166A, and ordering the board to take the neces-
sary steps to prevent the installation and maintenance of
a CATV system until the licensee complied with c. 166A.
The defendants appealed.

We summarize the agreed facts. The plaintiffs are tax-
payers, residents and property owners of the town. The
defendants are the members of the board, the licensee
and its parent corporation. On May 3, 1971, the board
voted to approve the issuance to the licensee of a license
to construct and operate a CATV system in the town,
and executed and issued a document entitled "License to
Install and Maintain Television Cable Lines within the
Town of Falmouth, Massachusetts." The license pro-
vided that it was granted under G. L. c. 166. There was
no public hearing, "other then [sic] an application for a
pole set permit." There was no by-law of the town au-
thorizing CATV licenses. After the license was issued,
the licensee notified television broadcast stations, made
joint use agreements for rental of space on poles and in
conduits of the telephone company and the electric utility
serving the town, and negotiated but did not execute a
proposed construction contract. On November 16, 1971,
St. 1971, c. 1103, took effect. The licensee complied
with the requirements of § 4 for a replacement license,

and in December, 1972, the board voted to issue the replacement license. Subsequently the Federal Communications Commission (FCC) "unconditionally certified" the licensee and the proposed replacement license.

The judge ruled that when G. L. c. 166A came into effect the licensee had not commenced construction or operation of a CATV system. He further ruled that G. L. c. 166, §§ 21 and 25, merely authorize permits for laying lines under and across public ways and places, and the establishment of regulations for the erection and maintenance of such lines. Such a permit, he ruled, was not "a license or permit for construction and operation" of a CATV system within the meaning of § 4; and there was no authority to grant a right to construct and operate a CATV system.

Briefs in support of the licensee have been submitted by the Massachusetts CATV Commission (the CATV commission) and the New England Cable Television Association as friends of the court. A brief in support of the plaintiffs has been submitted by the Cape Cod Cablevision Corporation.

1. *Background.* From 1950 to 1965 the CATV industry grew rapidly in the United States without any comprehensive government regulation. After 1960 the FCC gradually asserted jurisdiction over CATV. See *United States* v. *Southwestern Cable Co.,* 392 U.S. 157, 161-167 (1968). In 1966 the Attorney General of Massachusetts expressed the opinion that "Massachusetts does not have the constitutional authority to impose general regulation upon CATV." He went on to suggest that State and local authorities might "as a matter of contract, for valid consideration such as a grant of permission to use municipal rights-of-way (see G. L. c. 166, § 25), impose reasonable conditions upon CATV operations which do not conflict with Federal policy. Likewise, municipalities may impose certain regulations of a particularly local nature, such as by-laws or ordinances governing the

location of poles and cables." Rep. A. G., Pub. Doc. No. 12, at 350, 352 (1966).

In 1968 a different Attorney General reviewed the situation. Rep. A. G., Pub. Doc. No. 12, at 182, 183, 184 (1968). He found in G. L. c. 166, §§ 21 and 25, authority for a municipality "merely" to grant a licensee "the right to lay its television lines under and across public ways or places," and to establish reasonable regulations relating "only to 'the erection and maintenance' of the lines." Except for those "very limited powers," he concluded, "the towns and cities have no additional powers which they may legally exercise with respect to granting CATV franchises, licenses and permits other than such powers, if any, as they may invoke by proper action under the Home Rule Amendment." He also concluded that the Department of Public Utilities had no authority for direct regulation of CATV systems.

Later in 1968, in the *Southwestern Cable* case, *supra*, the Supreme Court of the United States upheld the authority of the FCC to regulate CATV systems. 392 U.S. at 178. The FCC regulations then in force laid down many requirements for the operation of CATV systems, but franchises were granted by State or local regulatory agencies. *Id.* at 163 n.15. The FCC regulations on commencing operations referred to "obtaining a franchise," to "entering into a lease or other arrangement to use facilities," and to cases "where no new local authorization or contractual arrangement is necessary." 47 C.F.R. § 74.1105(a) (Supp. 1971), as amended through 32 Fed. Reg. 10306 (1967). For the present regulations, see 47 C.F.R. §§ 76.1-76.617 (Supp. 1974), inserted by 37 Fed. Reg. 3278 (1972), as amended, particularly Subpart C-Federal-State/Local Regulatory Relationships § 76.31. Thus the Federal regulatory scheme contemplated State or local authorization. *TV Pix, Inc.* v. *Taylor*, 304 F. Supp. 459, 466 (D. Nev. 1968), aff'd 396 U.S. 556 (1970). But there was serious doubt whether any State or local authority in Massachusetts could go

beyond a regulation of the erection and maintenance of cable lines.

2. *The 1971 statute and the CATV commission.* In this situation St. 1971, c. 1103, was enacted, effective November 16, 1971, entitled "An Act permitting cities and towns to authorize the installation and operation of community antenna television systems and providing for the regulation thereof." Section 1 of the statute inserted G. L. c. 166A, establishing the CATV commission and providing for municipal licensing of CATV systems subject to regulations of the commission and review by it. As originally proposed, the grandfather clause would have protected only those who had commenced construction or operation. 1971 House Doc. No. 5221, app. D, § 2. The provision protecting permits in the absence of construction or operation was added during the enactment process.

The CATV commission informs us that only two municipalities acted pursuant to the Home Rule Amendment, and that all other licenses or permits granted before the effective date of the 1971 statute were granted pursuant to G. L. c. 166, like the license in the present case. The judge's ruling in the present case, we are told, would invalidate purported authorizations granted in some twenty-five municipalities. The commission has interpreted the protection of St. 1971, c. 1103, § 4, the grandfather clause, as extending to "licenses" or "franchises" granted pursuant to c. 166, even though they contained unauthorized terms, "so long as there was compliance with the procedures for issuance of a Chapter 166 permit and the authorization was not procured by fraud, misrepresentation, bribery or any other criminal act." Under this interpretation the terms of the license would be brought in compliance with c. 166A by the issuance of a replacement license pursuant to the grandfather clause.

3. *Interpretation of the grandfather clause.* We think the reading given § 4 by the CATV commission is a permissible one, and we adopt it. See *Board of Educ.* v.

*Assessor of Worcester,* 368 Mass. 511, 515-516 (1975), and cases cited. A person subject to the proviso of § 4 need not apply for a license or pay an application fee, but is to comply with other provisions of c. 166A and receive a new license "which shall replace any prior permit or license, however designated." Two categories are subject to the proviso: (1) "any person who . . . has received a license or permit for construction and operation" and (2) "any person who . . . has commenced construction or operation." As to the second category, no distinction is drawn between persons whose licenses contained invalid terms, and other persons. It appears likely that every license for "construction and operation," as distinguished from "erection and maintenance" of lines, contained terms of doubtful validity under the 1968 opinion of the Attorney General. If so, to exclude all such licenses from the proviso would be to deprive the first category of any effect at all. "An intention to enact a barren and ineffective provision is not lightly to be imputed to the Legislature." *Insurance Rating Bd.* v. *Commissioner of Ins.,* 356 Mass. 184, 189 (1969), and cases cited.

Nor do we think it would serve a useful purpose for us now to review the validity of the superseded terms of licenses subject to the grandfather clause. The obvious purpose of the 1971 statute was to substitute firm lines of authority and coherent regulation for the preexisting chaos and doubt. To that end, in mandatory language, the statute provides that a person protected by the grandfather clause "shall" receive a replacement license. See *Massachusetts Soc'y of Graduate Physical Therapists, Inc.* v. *Board of Registration in Medicine,* 330 Mass. 601, 603 (1953). The statute should be interpreted to carry out its purpose rather than to preserve for litigation the numerous questions as to the validity of particular license terms which could arise in the pre-1971 situation. Unauthorized terms in licenses were void, but the inclusion of unauthorized terms did not totally invalidate the licenses or

deprive them of the protection of the grandfather clause. Cf. *New England Tel. & Tel. Co.* v. *Brockton*, 332 Mass. 662, 666-667 (1955).

4. *Validity of the license.* General Laws c. 166, § 21, as appearing in St. 1951, c. 476, § 1, provides in relevant part, "A company incorporated . . . for the transmission of television signals, whether by electricity or otherwise, . . . may, under this chapter, construct lines for such transmission upon, along, under and across the public ways . . . by the erection or construction of the poles, . . . conduits and other fixtures, except bridges, which may be necessary to sustain or protect the wires of its lines; but such company shall not incommode the public use of public ways or endanger or interrupt navigation." Section 25, as appearing in St. 1951, c. 476, § 2, provides in part, "The selectmen may, within their towns, permit . . . television lines to be laid under any public way or place, and may establish reasonable regulations for the erection and maintenance of all lines for the transmission of intelligence by . . . television . . . ." Those sections are to be read with § 22 prescribing the procedure (G. L. c. 166, § 22, as amended through St. 1948, c. 550, § 36). See *Sudbury* v. *Department of Pub. Util.*, 343 Mass. 428, 433 (1962); *Metropolitan Home Tel. Co.* v. *Emerson*, 202 Mass. 402, 407-408 (1909).

The license here in issue was not effective in so far as it purported to grant authority to erect new poles. An application for a permit to erect poles, under § 22, first paragraph, can only be granted after a public hearing. The agreed facts do not show that there was a public hearing. In any event, there was no grant of "a location for such line, specifying therein where the poles . . . may be placed," as required by § 22. See *Metropolitan Home Tel. Co.* v. *Emerson*, 202 Mass. 402, 404-406 (1909); cf. *Opinion of the Justices*, 293 Mass. 589, 607 (1935).

But the license also granted authority to the licensee "to install and maintain cable lines . . . on existing poles" owned by the telephone company and the electric utility

serving the town. Under § 22, second paragraph, such a grant may be made "without notice or hearing, by order." The locations of existing lines were already fixed, and the grant was of course subject to the consent of the owners of the poles and to any limitations to which their permits were subject. The license was valid and effective to that extent, and hence it came within the grandfather clause as we have interpreted it.

5. *Disposition.* The judgment is reversed. A new judgment is to be entered declaring that the license issued to the licensee by the board, dated May 3, 1971, was a valid permit under G. L. c. 166 and constituted a license or permit within St. 1971, c. 1103, § 4.

*So ordered.*

KAPLAN, J. (concurring). I agree with the result and with the court's opinion, of which a particularly telling argument, for me, is the fact that the CATV commission reads § 4 of St. 1971, c. 1103, as covering the defendant "licensee" and others in similar position. Left without the aid of such a judgment on the part of the regulatory agency, I am frank to say I would be reluctant to hold under § 4 that a license to install cable lines on existing poles, granted by selectmen of the town without notice or hearing, could be inflated into a full license under G. L. c. 166A. That interpretation of § 4 is, however, a permissible one textually, and I am bound to pay attention to the views of a commission presumptively knowledgeable in the field and charged with protecting the public interest.