JANET T. HEBB *vs*. ALLAN LAMPORT & another,
trustees.

Norfolk.   January 13, 1976. — March 29, 1976.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Zoning,* Size of lots, Multiple dwelling, Construction of by-law by
building inspector.

A formula in a zoning by-law which required a minimum lot area for
multifamily dwellings of 6,000 square feet plus 1,000 square feet per
bedroom per unit required a lot area of 6,000 square feet for each
dwelling unit plus 1,000 square feet for each bedroom. [203-209]

Where a judge found that a building inspector had misinterpreted a
provision of a town's zoning by-law with respect to the minimum
lot area required for multifamily dwellings and ordered entry of a
judgment construing the provision properly but excluding applica-
tion of the provision as so construed to building permits issued to or
applied for by builders prior to the date of the complaint, he did not
abuse his discretion in refusing to exempt from the provision's re-
quirement a builder which had filed with the town's planning board
a preliminary plan for the subdivision of the land but had not ap-
plied for nor been issued a building permit. [209-210]

BILL IN EQUITY filed in the Probate Court for the county
of Norfolk on April 9, 1974.

Upon removal of the case to the Superior Court it was
heard by *Hallisey,* J.

*Stephen Carr Anderson (Julian J. D'Agostine & Wil-
liam B. Tyler* with him) for the defendants.

*Robert I. Kalis (Leon J. Lombardi* with him) for the
plaintiff.

*John J. McCarthy (Stanley V. Ragalevsky* with him)
for John W. Keith Builders, Inc., intervener.

*Gael Mahony & John A. Gilmore,* for Kaufman and
Broad Homes, Inc., amicus curiae, submitted a brief.

GRANT, J.   This is a bill in equity (originally filed in
a Probate Court but subsequently removed to the Superior

Court) brought in 1974 by a resident and registered voter of the town of Stoughton (who is also a landowner therein) to challenge, and to secure a previously requested reversal of, a long standing construction by the town's building inspector of so much of § VI ("DIMENSIONAL AND DENSITY REGULATIONS"), B (*"Table of Dimensional and Density Regulations"*), of the zoning by-law of the town (as adopted in 1970 and in effect until 1974) as set out the minimum lot area requirement applicable to land lying in the so called "Residential-Multifamily" (R-M) zoning districts when used for multifamily dwelling purposes.[1] The defendants originally named were the building inspector, the town and the planning board of the town. By assent, John W. Keith Builders, Inc. (Keith), a builder and the holder of building permits issued by the building inspector in accordance with his construction of the by-law, and the trustees of Meadowbrook Trust (Meadowbrook), as the owners of land lying in an R-M district and desirous of obtaining building permits, were permitted to intervene as parties defendant.

The case was submitted to a judge of the Superior Court on a brief statement of agreed facts and on copies of the zoning by-laws adopted by the town in 1964[2] and 1970 (the latter as amended in certain respects in 1971) and a copy of an amendment of the aforementioned § VI, B, which was adopted by the town in 1974, shortly after the filing of the plaintiff's bill. The judge excluded testimony proffered by the defendants as to the intention of the draftsmen of the 1970 version of § VI, B, and as to the planning board's subsequent interpretation thereof.

It appears from the agreed facts that the controversy centers on the proper construction of that portion of the by-law's table of dimensional and density regulations

[1] No question has been raised as to the plaintiff's standing to maintain the bill. See *Flynn v. Seekonk,* 352 Mass. 71, 73-74 (1967). See now G. L. c. 231A, § 2, as amended by St. 1974, c. 630, § 1.

[2] No one has argued that the 1964 by-law is material to the present controversy.

which was originally adopted in 1970 and is graphically reproduced in the margin (formula).[3] The plaintiff contends that the formula required a minimum lot area "for multi-family units in ... [an] R-M district ... [of] 6,000 square feet per unit plus 1,000 square feet for each bedroom." The building inspector's construction had been that the formula required only an initial dedication of 6,000 square feet of land plus 1,000 square feet for each bedroom to be located on the particular lot. During the period from the adoption of the 1970 by-law until the filing of the plaintiff's bill the building inspector had issued building permits for approximately 1,400 multifamily dwelling units in accordance with his construction of the minimum lot area requirements of § VI, B, as then in effect. As of the time of trial (June of 1975) approximately

---

[3]
"

| District | Use | Minimum Lot Area (sq. ft.) |
|---|---|---|
| R-M | Multifamily high-rise structure (more than four stories) | 6,000 + 1,000 per bedroom per unit |
|  | Any other permitted use | 6,000 + 1,000 per bedroom per unit " |

A "[l]ot" is defined in § II ("DEFINITIONS") of the by-law as "[a]n area or parcel of land or any part thereof, not including water area, in common ownership, designated on a plan filed with the ... [building inspector] by its owner or owners as a separate lot." A reading of the "Table of Use Regulations" found in § V ("USE REGULATIONS"), B (*"Permitted Uses"*), as amended in 1971, in the light of the definitions of *"Dwelling," "Dwelling Unit"* and *"Dwelling, Multifamily"* found in § II indicates that the "other permitted use[s]" referred to in the table of dimensional and density regulations include various forms of multifamily dwellings which are permitted as of right in an R-M district but which do not involve "high-rise" construction. The word "unit," which appears in the formula, is nowhere defined, but the case has been argued to us on the basis that the intended reference is to an individual dwelling unit which forms a part of a multifamily dwelling. That interpretation is consistent with (if not required by) the definitions just cited and with the provisions of § VI, G, 3, of the by-law, which will be discussed later in this opinion.

1,000 of those units (more than 500 of them condominiums) had been constructed and 300 more were under construction. The 1974 amendment of § VI, B, struck out the words "6,000 + 1,000 per bedroom per unit" appearing in the table of dimensional and density regulations (n.3, *supra*) and replaced them with the words "6,000 sq. ft. per dwelling unit plus 1,000 sq. ft. per bedroom per dwelling unit."[4]

The judge filed a memorandum of decision in which he ruled in favor of the plaintiff's construction of the formula and ordered the entry of a judgment consistent therewith. Keith and Meadowbrook moved for a new trial and related relief. Kaufman and Broad Homes, Inc. (Kaufman), a developer of a partially completed condominium complex in an R-M district for which 101 various building permits had been issued by the building inspector during 1973 and 1974, moved for (and was granted) leave to be heard as amicus curiae on the form of the judgment. Following a further hearing which is not reported, the judge found that Keith, Meadowbrook and Kaufman had "acquired substantial rights, incurred substantial obligations, and made substantial investments, all in good faith reliance on the interpretation by the [b]uilding [i]nspector, and . . . [would] suffer substantial loss and harm if the [c]ourt's declaration . . . [should be] applied to them.[5] The judgment thereafter entered contained a declaration consistent with the plaintiff's construction of the formula but pro-

---

[4] Nothing said in our opinion is to be taken as any indication of how we would construe the quoted words if they were presented to us for our consideration.

[5] There is nothing in the record to support the quoted finding so far as Meadowbrook is concerned, nor does it appear that Meadowbrook ever applied for a building permit. It is, however, the owner of land in an R-M district, and it is agreed in the briefs that prior to the filing of the plaintiff's bill herein Meadowbrook had filed with the planning board a preliminary plan for the subdivision of its land in accordance with the building inspector's construction of the formula. See the first paragraph of G. L. c. 40A, § 7A, as in effect prior to St. 1975, c. 808, § 3. See *Vazza* v. *Board of Appeals of Brockton,* 359 Mass. 256, 259-263 (1971); *Bellows Farms, Inc.* v. *Building Inspector of Acton,* 364 Mass. 253, 259-260 (1973).

vided, in effect, that that construction should not be applied to building permits issued to or applied for by Keith, Meadowbrook and Kaufman prior to the date of the filing of the plaintiff's bill (April 9, 1974) but should apply to all permits first applied for after that date.[6] The building inspector and Meadowbrook appealed.[7]

Much of Meadowbrook's argument is devoted to mathematical demonstrations of alleged inconsistencies of the plaintiff's construction with the dimensional and density requirements applicable to uses in other types of zoning districts (see *Green* v. *Board of Appeal of Norwood*, 358 Mass. 253, 257-259 [1970]) and to supposedly undesirable results which, it is said, would have flowed from the plaintiff's construction of the formula. It also argues that there was error in excluding the proffered testimony as to the intention of the draftsmen of the 1970 by-law, but we reject the argument because there was nothing to show that any such intention was ever communicated to anyone. See *Addison-Wesley Publishing Co. Inc.* v. *Reading*, 354 Mass. 181, 187 (1968); *Parmenter* v. *Board of Appeals of Grafton*, 360 Mass. 852 (1971).

The plaintiff argues that her construction of the formula would have yielded minimum lot sizes consistent with those required by the table of dimensional and density regulations for dwelling units located in other types of residentially zoned districts. The plaintiff also seeks to emphasize the action taken by the town meeting in 1974, which she says confirms her construction of the formula.

---

[6] Admittedly, this is not quite what the judgment recites, but it is the only interpretation which makes sense to us. It should serve to allay the fears of Keith concerning permits issued to it on April 9, 1974, but presumably applied for prior to that date.

[7] After this case had been specially advanced for argument and most of the briefs had already been filed the town belatedly moved in this court for leave to claim an appeal late from so much of the judgment as excepted from its operation "original applications for building permits filed prior to April 9, 1974." The motion was denied by a single justice. At a later date, shortly prior to oral argument, the building inspector's appeal was dismissed at his request for reasons having nothing to do with the merits of his position.

The difficulty with that contention is that in the absence of any indication of what may have motivated the town meeting (such as a report of the planning board under G. L. c. 40A, § 6, as in effect prior to St. 1975, c. 808, § 3), we have no means of knowing whether the intention was to overrule the building inspector's construction or was to adopt an entirely new policy with respect to density requirements applicable to multifamily dwellings lying in R-M districts.[8]

There does not appear to be any real dispute between the plaintiff and Meadowbrook as to the ordinary principles of construction which should be employed to determine the intended meaning of the formula in question. "None of the words of a ... [by-law] is to be regarded as superfluous, but each is to be given its ordinary meaning without overemphasizing its effect upon the other terms appearing in the ... [by-law], so that the enactment considered as a whole shall constitute a consistent and harmonious ... [legislative] provision capable of effectuating the presumed intention of the ... [town meeting]." *Bolster* v. *Commissioner of Corps. & Taxn.* 319 Mass. 81, 84-85 (1946). Accord, e.g., *Commonwealth* v. *Woods Hole, Martha's Vineyard & Nantucket S.S. Authy.* 352 Mass. 617, 618 (1967). Compare *Selectmen of Hatfield* v. *Garvey,* 362 Mass. 821, 826 (1973) ("Generally, a zoning by-law must be read in its complete context and be given a sensible meaning within that context").

We think the building inspector's construction violated those principles by ignoring certain words appearing on the face of the formula and by taking the entire formula out of context. His construction attributed no functional or other significance to the concluding words "per unit" and paid no heed to the additional and almost immediately ensuing verbal requirement of § VI, G, 3, of the by-law that "[t]he minimum lot area required per each individual

---

[8] The briefs of Keith and Kaufman are devoted primarily to the preservation of the exemption from the scope of the judgment which the judge created in their favor.

dwelling *unit . . .* shall be multiplied by the number of such *units* to obtain the minimum lot area required for the total tract of land" (emphasis supplied).[9] That section focuses on the ultimate question which must be answered by a developer of multifamily housing, by the planning board, and by the building inspector, namely, the total number of individual dwelling units which can be constructed on any given area of land lying in an R-M district. It does so by first concentrating on "[t]he minimum lot area required per each individual dwelling unit." The quoted words, when taken in the context of multifamily dwellings, obviously refer to the formula "6,000 + 1,000 per bedroom per unit" which appeared in the immediately preceding table of dimensional and density regulations in the column entitled "Minimum Lot Area (sq. ft.)" (see n.3).

The plaintiff's construction of the formula meshes with the verbal requirement of § VI, G, 3, by yielding a minimum lot area measured in terms of the area required for each individual dwelling unit, a quantity capable of ready and direct translation into the total number of dwelling units which could properly have been constructed on any given area of land. The building inspector's construction did not mesh with § VI, G, 3, because it yielded a mini-

---

[9] Section VI ("DIMENSIONAL AND DENSITY REGULA-TIONS"), G (*"Other General Dimensional and Density Provisions"*), read in material part as follows: *"In addition to* the regulations in . . . [the table of dimensional and density regulations] the following regulations shall apply: . . . 3. Except for planned developments for multifamily development, cluster residential development, planned unit residential development, planned business or industrial development, community facilities, and public utilities, only one principal structure shall be permitted on a lot. In the case of planned multifamily developments other than planned unit development, the minimum distance between the walls of such principal buildings which contain windows shall be twice the minimum side yard or side set back required in the District. *The minimum lot area required per each individual dwelling unit,* building, or other unit of use *shall be multiplied by the number of such units to obtain the minimum lot area required for the total tract of land.* Other area regulations shall apply to the tract as a whole." (Emphasis supplied.) It seems clear to us from admissions made by the building inspector in his answer to the plaintiff's bill that he ignored this provision in deciding whether to issue building permits for multifamily dwellings to be constructed in R-M districts.

mum lot area which (apart from the initial dedication of 6,000 square feet) was measured in terms of total numbers of bedrooms, completely without regard to the numbers of individual dwelling units in which the total numbers of bedrooms were to be found. His construction failed to yield one of the factors necessary to the determination of "the minimum lot area required for the total tract of land" (§ VI, G, 3).[10] The plaintiff's construction of the formula comports with the usual principles of construction set out in the cases cited above and in numerous other cases to the same effect. We conclude that as between the conflicting constructions contended for in this case the one submitted by the plaintiff is the proper one.

In reaching this conclusion we have obviously attached no weight to the building inspector's long standing construction of the formula, apparently concurred in by the planning board. We see no ambiguity in the formula when it is considered in context, or any real cause for doubt as to the proper conclusion. Contrast *Cleary* v. *Cardullo's, Inc.* 347 Mass. 337, 343-344 (1964); *Green* v. *Board of Appeal of Norwood,* 358 Mass. 253, 259, n.6 (1970); *Palmer* v. *Selectmen of Marblehead,* 368 Mass. 620, 628 (1975); *Gillis* v. *Mass. Cablevision, Inc.* 369 Mass. 526, 531, 534 (1976). That being so, a blind deference to the building inspector would be tantamount to our abdicating the judicial function.

The exemption which the judge created from the scope

---

[10] Both constructions would have yielded the same result if only one dwelling unit containing a given number of bedrooms was to be located on a particular tract. Thus, on both constructions a single one-bedroom unit would have required 7,000 square feet, a single two-bedroom unit would have required 8,000 square feet, and a single three-bedroom unit would have required 9,000 square feet. The differences came when more than one dwelling unit was to be located on a given tract. Suppose a complex comprised of three one-bedroom units. The plaintiff would have required 21,000 square feet (3 × 7,000); the building inspector appears to have required only 9,000 square feet (6,000 + [1,000 × 3]). Suppose a complex of one one-bedroom unit, one two-bedroom unit and one three-bedroom unit. The plaintiff would have required 24,000 square feet (7,000 + 8,000 + 9,000); the building inspector appears to have required only 12,000 square feet (6,000 + [1,000 × 6]).

of his judgment was, as we have seen, cast in terms of whether a particular developer had applied for or received a building permit prior to the date of the filing of the plaintiff's bill herein. Meadowbrook tells us in one of its briefs that it had not applied for a permit by the critical date but that it had by that date filed with the planning board a preliminary plan for the subdivision of its land which (it says) would have ripened into a building permit but for the commencement of the present litigation.[11] It now asks us to expand the judge's exemption so as to place it (Meadowbrook) on a par with Keith and Kaufman by giving it the same benefit of the building inspector's erroneous construction of the formula. How far the judge would go in exempting anyone from the scope of his judgment was a matter of discretion (see *Hallenborg v. Town Clerk of Billerica*, 360 Mass. 513, 518-520 [1971]; *Kelloway v. Board of Appeal of Melrose*, 361 Mass. 249, 256-257 [1972]), and there is now no longer anyone entitled to complain that the judge went as far as he did (see n.7, *supra*). It appears likely from the pleadings and the briefs that Meadowbrook is only one of numerous developers similarly situated. The monetary extent of Meadowbrook's reliance on the building inspector's construction of the formula is uncertain at best (see n.5, *supra*). There is nothing on this record to suggest that a refusal to expand the judge's exemption would result in Meadowbrook's being unable to develop its land in some fashion. A line has to be drawn somewhere (see *Pastan v. Board of Appeals of Billerica*, 2 Mass. App. Ct. 844 [1974]), and in the exercise of our discretion we decline to expand the exemption in Meadowbrook's favor.

It appears to us that a misconception crept into the first

---

[11] It appears from the original papers that shortly after the completion of the pleadings the Probate Court, with the assent of all parties, entered a preliminary injunction against the building inspector's issuing further permits in accordance with his construction of the formula. That injunction was subsequently modified, but only with respect to permits for the construction of housing for the elderly.

paragraph of the judgment.[12] It is not clear from the face of the judgment that it was intended to apply only to the formula as it read prior to the 1974 amendment. We think the first paragraph of the judgment should be modified so as to state in express terms that the formula "6,000 + 1,000 per bedroom per unit" which appeared in the column entitled "Minimum Lot Area (sq. ft.)" in the table of dimensional and density regulations of the zoning by-law of the town of Stoughton until the effective date[13] of the vote adopted by said town on May 6, 1974, required a minimum lot area for each individual dwelling unit located in a "Residential-Multifamily" zoning district of a number of square feet of land equal to the sum of (1) 6,000 and (2) the product of (a) 1,000 and (b) the number of bedrooms in such unit. The second paragraph of the judgment is to be modified so as to reflect the interpretation thereof which is found in this opinion (*supra*, at 206). As so modified the judgment is affirmed. Costs of appeal are not to be awarded to any party.

*So ordered.*

---

[12] The judgment phrases the maximum density in the R-M districts in terms of multifamily buildings rather than in terms of multifamily dwelling units, without regard to the number of dwelling units included within a particular building. The judge himself corrected a like misconception at two points in his original memorandum and decision but neglected to do so in the judgment itself.

[13] See G. L. c. 40, § 32, as in effect prior to St. 1975, c. 808, § 1.